IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| CARRIE CARTER,<br><br>                  Plaintiff,<br><br>    v.<br><br>ETHICON ENDO-SURGERY, INC.,<br>ETHICON ENDO-SURGERY, LLC,<br>JOHNSON & JOHNSON HEALTH CARE<br>SYSTEMS, INC., and<br>JOHNSON & JOHNSON CONSUMER, INC.<br>                  Defendants. | Civil Action No. _____<br><br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S COMPLAINT

COMES NOW, Carrie Carter, Plaintiff, (hereinafter referred to as "Plaintiff" or "Carter") complaining of Defendants, Ethicon Endo-Surgery, Inc., Ethicon Endo-Surgery, LLC, Johnson & Johnson Health Care Systems, Inc. and Johnson & Johnson Consumer, Inc., (hereinafter referred to as "Defendants"), and would respectfully show unto the Court as follows:

## I. INTRODUCTION

1.1     Defendants, and each of them, designed, manufactured, and marketed without proper notice, defective Ethicon Endo-Surgery Staplers. The FDA recently reported that during the time period from January 1, 2011 through December 31, 2018 it received close to 110,000 reports related to issues with surgical staplers.  Of these, 412 were submitted as deaths, 11,181 were submitted as serious injuries, and 98,404 were submitted as malfunction.[1]

---

[1] FDA Executive Summary Prepared for the May 30, 2019 Meeting of the General and Plastic Surgery Devices Panel Reclassification of Surgical Staplers for Internal Use: https://www.fda.gov/media/126211/download

1.2     Plaintiff Carrie Carter was injured when a surgical stapler, designed, manufactured, and marketed by Defendants, malfunctioned during her April 23, 2019 surgery, resulting in a leak in her abdomen that had to be repaired through a series of subsequent surgeries.

## II.  PARTIES

2.1.     At all times material, Plaintiff Carrie Carter was an individual residing in the State of Colorado.

2.2     At all times material, Defendant Ethicon Endo-Surgery, Inc., was and is an Ohio corporation with its principal place of business at 4545 Creek Road, Mail Location 11, Cincinnati, Ohio 45242.  At all times material, Defendant Ethicon Endo-Surgery, Inc., has been conducting business throughout the State of Colorado and maintains significant, systematic and continuous contacts throughout the State of Colorado, but does not appear to have a designated agent within the state upon whom service of process may be had for causes of action arising out of such business.

2.3     At all times material, Defendant Ethicon Endo-Surgery, LLC, was and is a foreign corporation with its principal place of business at 475 Calle C, Guaynabo, Puerto Rico 00969. At all times material, Defendant Ethicon Endo-Surgery, LLC, has been conducting business throughout the State of Colorado and maintains significant, systematic and continuous contacts throughout the State of Colorado, but does not appear to have a designated agent within the state upon whom service of process may be had for causes of action arising out of such business.

2.4     At all times material, Defendant Johnson & Johnson Health Care Systems, Inc., ("Johnson & Johnson") was and is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Defendant Johnson &

Johnson can be served with process through its Chief Executive Officer, Alex Gorsky, One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  At all times material, Johnson & Johnson has been conducting business throughout the State of Colorado and maintains significant, systematic and continuous contacts throughout the State of Colorado, but does not appear to have a designated agent within the state upon whom service of process may be had for causes of action arising out of such business.

2.5     At all times material Defendant Johnson & Johnson Consumer, Inc., ("Johnson & Johnson Consumer") was and is a New Jersey corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  Defendant Johnson & Johnson Consumer can be served with process through its Chief Executive Officer, Alex Gorsky, One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  At all times material, Defendant Johnson & Johnson Consumer, Inc. has been conducting business throughout the State of Colorado and maintains significant, systematic and continuous contacts throughout the State of Colorado, but does not appear to have a designated agent within the state upon whom service of process may be had for causes of action arising out of such business.

2.6     Defendants Ethicon Endo-Surgery, Inc., Ethicon Endo-Surgery, LLC, Johnson & Johnson Health Care Systems, Inc., and Johnson & Johnson Consumer, Inc., shall be referred to herein individually by name or jointly as the "Ethicon Defendants."

### III.  JURISDICTION AND VENUE

3.1     The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy exceeds $75,000, exclusive of interests and costs, and Plaintiff is a citizen of a different state than one or more of Defendants.

3.2     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district.

3.3     At all times material, Ethicon Endo-Surgery, Inc., has been in the business of the researching, developing, selling, and marketing of surgical staplers and staples.  At all times material, Ethicon Endo-Surgery, Inc., has been in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the surgical stapler and staples that make the basis of this suit in the State of Colorado.  This Court has personal jurisdiction over Ethicon Endo-Surgery, Inc., because Defendant has submitted itself to the jurisdiction of this Court by engaging in conduct set forth in this Complaint in the State of Colorado.

3.4     At all times material, Ethicon Endo-Surgery, LLC, has been in the business of the researching, developing, selling, and marketing of surgical staplers and staples.  At all times material, Ethicon Endo-Surgery, LLC, has been in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the surgical stapler and staples that make the basis of this suit in the State of Colorado.  This Court has personal jurisdiction over Ethicon Endo-Surgery, LLC, because Defendant has submitted itself to the jurisdiction of this Court by engaging in conduct set forth in this Complaint in the State of Colorado.

3.5     At all times material, Johnson & Johnson Health Care Systems, Inc., has been in the business of the researching, developing, selling, and marketing of surgical staplers and staples.  At all times material, Johnson & Johnson Health Care Systems, Inc., has been in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the surgical stapler and staples that make the basis of this suit in the State of Colorado. This Court has personal jurisdiction over Johnson & Johnson Health Care Systems, Inc., because

Defendant has submitted itself to the jurisdiction of this Court by engaging in conduct set forth in this Complaint in the State of Colorado.

3.6     At all times material, Johnson & Johnson Consumer, Inc., has been in the business of the researching, developing, selling, and marketing of surgical staplers and staples. At all times material, Johnson & Johnson Consumer, Inc., has been in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the surgical stapler and staples that make the basis of this suit in the State of Colorado.  This Court has personal jurisdiction over Johnson & Johnson Consumer, Inc., because Defendant has submitted itself to the jurisdiction of this Court by engaging in conduct set forth in this Complaint in the State of Colorado.

3.7     The Ethicon Defendants are individually, jointly, and severally liable to Plaintiff for damages suffered by Plaintiff arising from their design, manufacturing, marketing, labeling, distribution, sale, and placement of the defective product at issue in this suit.  All acts were effectuated directly and indirectly through Defendants' respective agents, servants, employees, and/or owners, acting within the course and scope of their representative agencies, services, employments, and/or ownership.

3.8     Defendants are vicariously liable for the acts and/or omissions of their employees and/or agents, who were at all times relevant acting on Defendants' behalf and within the scope of their employment or agency with Defendants.

## IV. <u>FACTS</u>

4.1     On April 23, 2019, Plaintiff Carrie Carter underwent a laparoscopic longitudinal sleeve gastrectomy procedure performed by Dr. Andrew J. Morse at Community Hospital in Grand Junction, Colorado.  Dr. Morse noted in part in the operative report, "The staple line was

started 6 cm from the pylorus. A 60 mm length black staple load with Peristrip staple line reinforcement was applied to the stomach angling to the left along the bougie.  It was placed in such a way to assure that we did not make it too tight at the incisura…"

4.2    Dr. Morse further noted in his operative report in part, "The staple line was inspected and seen to be intact.  Additional 60 mm length green staple loads with Peristrip staple line reinforcement were placed on the stomach in a similar fashion overlapping the previous staple line towards the side of the stomach to remain…After each of these staplers was closed and inspection performed anteriorly and posteriorly, they were fired…We continued working in this fashion up to the angle of His, (sic) shying just away from the gastroesophageal (GE) junction to assure we did not staple the esophagus…

4.3    Dr. Morse also noted in his operative report in part, "The stomach was fully insufflated and either submersed in irrigation, or those portions of staple line not able to be submersed were bathed in irrigation. No bubbles were seen emanating from the staple line." Plaintiff's postoperative course was unremarkable, and Plaintiff was discharged on April 25, 2019.

4.4    On May 13, 2019, Plaintiff presented to Community Hospital complaining of abdominal pain and nausea/vomiting.  She was admitted after being diagnosed with tachypnea and hypoxemia and started on antibiotics.  A CT scan of her pelvis and abdomen was performed and showed a small amount of air around the gastroesophageal junction with no abscess or contrast extravasation.  Dr. Morse was concerned there was staple line leak present at the GE junction and decided to perform an esophagogastroduodenoscopy with esophageal stent placement.  Dr. Morse noted in his operative report in part, "No definitive leak site identified, but knowing that air was about the GE junction, we placed a stent to cover the lower 1/4th of the

esophagus that extended down to the mid-stomach. Stent was secured by placing two endoscopic clips on the proximal end…We did not perform laparoscopic or CT-guided drainage at this point as there was a small amount of free air with no contrast extravasation and no abscess. The patient will be on antibiotics." Dr. Morse also noted in the records that they would plan on removing the esophageal stent in 2-4 weeks. Plaintiff's postoperative course was unremarkable, and Plaintiff was discharged on May 15, 2019.

4.5 Plaintiff returned to Community Hospital on June 4, 2019 for her esophageal stent removal. Dr. Morse performed an Esophagogastroduodenoscopy and successfully removed the stent without any complications noted. Following the procedure, a CT Scan of Plaintiff's abdomen was performed which revealed clear contrast extravasation and accumulation coming from the staple line in the upper stomach. Dr. Morse then proceeded to place a jejunostomy drain at the site of the fluid accumulation. During the procedure, Dr. Morse encountered a large number of adhesions and bleeding while trying to access the source of the leak and determined it would be safer to perform percutaneous drainage. Dr. Morse placed a jejunostomy tube laparoscopically at the site of the leak. Dr. Morse then performed an Esophagogastroduodenoscopy which revealed that there were two openings present at the mid-stomach staple line. Dr. Morse injected fibrin sealant to the site of the leaks and attempted to place endoclips. He was unsuccessful in placing the endoclips at the sites of the leak and decided to abandon the attempt to place the clips since Plaintiff would not be receiving anything by mouth and he did not want to dislodge the fibrin sealant. Dr. Morse noted in his operative report that they would proceed with a CT-guided drain placement the following day and the drain will likely need to stay in place for at least six weeks. Dr. Morse also noted that he was hopeful that the drainage along with the fibrin sealant would allow the tissue to heal and not

require further intervention.  He also noted that if this approach did not work, they may need to place the stent lower on the stomach or attempt to place the endoclips at the site of the leaks again.

4.6     On June 5, 2019, Plaintiff underwent a CT-guided abscess drainage of left upper quadrant and placement of an 8.5 French pigtail drain placement.  Following the procedure, Plaintiff was placed on a J-tube for feedings.  Plaintiff was discharged on June 7, 2019 with orders for home health.  At the time of discharge, her jejunostomy tube was still in place and she was to continue J-tube feedings.

4.7     On July 11, 2019, Plaintiff's J-tube was removed.

4.8     On July 13, 2019, Plaintiff again presented to Community Hospital complaining of abdominal pain, nausea, and vomiting.  Plaintiff was admitted and underwent imaging which revealed that fluid was still present at the leak sites.  After evaluating the imaging results, Dr. Morse decided to perform an Esophagogastroduodenoscopy with placement of endoclips and application of fibrin glue at the site of the leak along with removal of drains by Dr. Morse on July 16, 2019.  Dr. Morse noted in part in his operative report, "A small leak site was noted proximally along the staple line.  An adjacent additional leak site was noted…" Dr. Morse also noted in his Operative Report, "Fibrin glue was injected through both openings.  Endoclips were applied at each opening.  Additional fibrin glue was then applied around the endoclips." Plaintiff's postoperative course was unremarkable, and Plaintiff was discharged the same day on July 16, 2019.

4.9     Subsequently, Plaintiff developed a fistula at the site of the leaks which she is still undergoing treatment for.

4.10    The failure of the surgical stapler and staples to properly close Plaintiff's esophagus resulted in a number of complications, including:

a) Development of sepsis;

b) stent placement;

c) stent removal and Laparoscopic jejunostomy placement;

d) CT guided drainage of fluid and placement of a drain tube;

e) feeding tube placed for more than month;

f) esophagogastroduodenoscopy with placement of endoclips and application of fibrin glue; and

g) ongoing care for the injuries she suffered in her April 23, 2019 surgery.

4.11    Plaintiff alleges on information and belief that one of the specific staplers used in her April 23, 2019 surgery was a model, known by Defendants, to frequently malfunction. In October of 2019, the Ethicon Defendants issued a recall on a number of its Echelon Flex Endopath Staplers, which included the stapler that was used in Plaintiff's surgery. Ethicon issued the recalls on the Echelon Flex Endopath Staplers because some devices may contain an out of specification component within the jaw of the device, which could lead to malformed staples. The recall further states that if a problem with the staple line is not recognized or is not adequately addressed, there is a potential risk of prolonged surgery, postoperative connection (anastomotic) leak, hemorrhage, hemorrhagic shock, additional surgical interventions, or death.

4.12    Plaintiff has since learned that the stapler in question was likely recalled and that the FDA recently reported that surgical staplers, including those manufactured by Defendants, have been responsible for tens of thousands of adverse outcomes attributed to malfunctioning staplers.

4.13    Based on the number of stapler-related injuries, in May 2019, the FDA proposed reclassifying surgical staplers for internal use from Class I to Class II (Special Controls).[2]

4.14    Despite knowing that its Ethicon Endo-Surgery Intraluminal Staplers caused injuries due to malfunction, Defendants, and each of them, represented and marketed the Ethicon Endo-Surgery Intraluminal Staplers as safe and effective.  Defendants, and each of them, failed to include warnings regarding potential malfunctions that were known to them, including the risks described in the FDA publication.[3]

4.15    Defendants intentionally engaged in the following conduct: 1) failing to provide warnings regarding the potential for its Echelon Flex Endopath Staplers to malfunction in a manner exactly like what occurred during Plaintiff's surgery; 2) failing to warn and inform surgeons of the potential for its Echelon Flex Endopath Staplers to malfunction in a manner exactly like what occurred during Plaintiff's surgery; 3) failing to recall its defective products until 2019 when it knew earlier that Echelon Flex Endopath Staplers were prone to malfunction.  By engaging in the conduct described above, Defendants engaged in willful, wanton, reckless, malicious behavior and/or exhibited a gross indifference to, and a callous disregard for human life, the safety and the rights of others, and more particularly, the rights, life and safety of the Plaintiff; and Defendants were motivated by consideration of profit, financial advantage, monetary gain, economic aggrandizement and cost avoidance, to the virtual exclusion of all other considerations.

## V. PLAINTIFF'S CAUSES OF ACTION

## A.      (STRICT LIABILITY MANUFACTURING DEFECT) Against all DEFENDANTS

5.1    Plaintiff hereby incorporates the allegations contained in the preceding

---

[2] FDA Executive Summary Prepared for the May 30, 2019 Meeting of the General and Plastic Surgery Devices Panel Reclassification of Surgical Staplers for Internal Use: https://www.fda.gov/media/126211/download

[3] *Id.* at Pg. 9.

paragraphs, as though fully set forth herein.

5.2     Plaintiff was harmed by Defendants' defective Echelon Flex Endopath Staplers, which was distributed, manufactured, and sold by Defendants.  Defendants' Echelon Flex Endopath Staplers contained a manufacturing and design defect that made it unsafe to perform the function it was intended to perform. Specifically, there was a design or manufacturing defect that would result in staple line failure and anastomotic leak despite proper utilization by a surgeon.

5.3     On October 3, 2019 Ethicon issued an Urgent Recall Field Safety Notice to medical providers instructing them to immediately remove any Echelon Flex Endopath Staplers from their inventory and returned them to Ethicon.  The recall was issued in Ethicon's words because they had, "identified the possibility that some Echelon Flex Endopath Staplers may contain an out of specification anvil component within the jaw of the device. The issue could lead to malformed staples and compromised stapled and compromised staple line integrity, which could in turn prolong surgery or cause postoperative anastomotic leak, hemorrhage, hemorrhage shock, additional surgical intervention or death." The Defendants also stated in the recall that they had identified the root cause and implemented corrective actions to address the issues.

5.4     On October 30, 2019, the FDA issued a Class One Device Recall for Defendants' Echelon Flex Endopath Staplers which were designed and manufactured for use in open or minimally invasive surgeries including thoracic and general surgeries including in patients undergoing laparoscopic longitudinal sleeve gastrectomy surgeries.  The recall was issued because the because the stapler may contain an out of specification component within the jaw of the device, which could lead to malformed staples, which can compromise staple line integrity.

5.5     Also, on March 3, 2019 the FDA issued a letter to medical providers warning them that were concerned about the safety of and reliability of surgical staplers based on increased amount of adverse events involving surgical staplers that they had received. The letter stated that the FDA's ongoing analysis of surgical staplers found that from January 1, 2011 to March 31, 2018 the FDA received over 41,000 individual medical device reports for surgical staplers including: 366 deaths; over 9,000 serious injuries; and over 32,000 malfunctions. The letter also stated the FDA was considering reclassifying surgical staplers from Class I devices to Class II devices due to the increasing adverse events reports they were receiving involving surgical staplers. Reclassifying surgical staplers for internal use as a Class II device would subject them to premarket notification and allow the FDA to establish mandatory special controls to help mitigate known risks of the device. The FDA is still conducting its investigation into the safety and effectiveness of surgical staplers and considering whether to reclassify them as Class II devices.

5.6     On information and belief, Plaintiff alleges the device subject to the recalls is the same device used in her April 23, 2019 surgery and has also been identified as the device that was used in her surgery by his medical providers and medical records.

5.7     The surgical stapler used in Plaintiff's April 23, 2019 surgery was: (1). manufactured by the Defendants; (2) malfunctioned as a result of manufacturing defect which rendered the surgical stapler unreasonably dangerous (3) the defect existed at the time the stapler was distributed by the Defendant as evidenced by the company's own recall notice and the FDA recall notice; and (4) the defect was a producing cause of Plaintiff's injuries.

5.8     As a direct and proximate result of Defendants' negligence, manufacturing and design defects, Plaintiff has incurred losses and damages for personal injury, loss of use and

enjoyment of life, the need for periodic medical examination and treatment, and economic losses, including additional medical expenses, and the expenditure of time and money, and will continue to incur losses and damages in the future.

5.9     Due to Defendants' negligence, failure to warn, manufacturing, and design defects, Plaintiff is entitled to compensatory damages in a sum to be determined by a jury, plus punitive damages in a sum equal to a multiplier of damages determined to be adequate by a jury.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## PLAINTIFF'S SECOND CAUSE OF ACTION

**B.     (STRICT LIABILITY DESIGN DEFECT) Against all DEFENDANTS**

5.10    Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

5.11    Plaintiff was harmed by Defendants' Echelon Flex Endopath Stapler, which was distributed, manufactured, and sold by Defendants.  Defendants' Echelon Flex Endopath Staplers contained a design defect that made it unsafe to perform the function it was intended to perform. Specifically, there was a design defect that would result in a compromised staple line integrity and anastomotic leak despite proper utilization by a surgeon.

5.12    As previously alleged, the Defendants' own recall notice and the FDA recall notice identified that the product used in Plaintiff's April 23, 2019 surgery was defectively designed.  Specifically, the October 3, 2019 recall instituted by the Defendants stated the recall was instituted because, ***"the staplers may contain an out of specification component within the jaw of the device, which could lead to malformed staples."*** Plaintiff alleges on information and belief that the defective design of the device used in Plaintiff's surgery was a cause of the device to malfunction and lead to insufficient firing.

5.13    Additionally, on October 30, 2019 the FDA issued a Class One Device Recall for Defendants' Endo-Surgery Intraluminal Staplers because, ***"the staplers may contain an out of specification component within the jaw of the device, which could lead to malformed staples."*** Plaintiff alleges on information and belief that the defective design of the device used in Plaintiff's surgery was a cause of the device to malfunction and fail to completely form staples.

5.14    These recall notices have been terminated and the Defendants have resumed manufacturing, marketing and selling the device that is the subject of Plaintiff's claims. Presumably the design defect issues have been fixed, otherwise the Defendants would not have resumed the manufacturing, marketing and selling of the device. This clearly indicates that a safer alternative design of the surgical stapler in question existed at the time of Plaintiff's surgery.   The design defect of the surgical stapler in question was a producing cause of Plaintiff's injuries as incorporated in the preceding allegations. Had the Defendants implemented the safer alternative design prior to Plaintiff's surgery it would have prevented or significantly reduced the risk of Plaintiff's injuries and implementing the safer alternative design would not have substantially impaired the Defendants' product's utility. Likewise, Plaintiff asserts it was economically and technologically feasible for the Defendants to implement the safer alternative design prior to the time the device left the Defendants' control.

5.15    As a direct and proximate result of Defendants' negligence, manufacturing and design defects, Plaintiff has incurred losses and damages for personal injury, loss of use and enjoyment of life, the need for periodic medical examination and treatment, and economic losses, including additional medical expenses, and the expenditure of time and money, and will continue to incur losses and damages in the future.

5.16    Due to Defendants' negligence, failure to warn, manufacturing, and design defects, Plaintiff is entitled to compensatory damages in a sum to be determined by a jury, plus punitive damages in a sum equal to a multiplier of damages determined to be adequate by a jury.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## PLAINTIFF'S THIRD CAUSE OF ACTION

**C.    (STRICT LIABILITY-FAILURE TO WARN) Against all DEFENDANTS**

5.17    Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

5.18    Defendants, and each of them, failed to provide accurate information to the public including surgeons, on the risks associated with using their Echelon Flex Endopath Staplers. Specifically, Defendants, and each of them, promoted the staplers as being safe while they knew about the risk of the staplers to malfunction and fail to completely form which could compromise staple line integrity.  As a result, neither Plaintiff nor her surgeon knew of the risks of injury like the one Plaintiff suffered, prior to her surgery.

5.19    Defendants, and each of them, knew that the Echelon Flex Endopath Stapler posed a risk to patients when used as intended because, as stated in the recalls issued by the Defendants and the FDA both stated, ***"the staplers may contain an out of specification component within the jaw of the device, which could lead to malformed staples."***[4] Defendants have hidden the true risks of the using the devices from surgeons and their patients.

5.20    Despite knowing about this defect, Defendants, and each of them, failed to warn potential surgeons or patients.

---

[4] https://www.fda.gov/medical-devices/medical-device-recalls/ethicon-recalls-echelon-flextm-endopathr-staplers-failure-completely-form-staples

5.21    The Defendants continued to market, manufacturer and sell the devices with the knowledge of the defects and potential risk of harm to patients and failed to inform potential patients and their physicians of these known defects and risks at the time of the sale of the devices.  The failure to notify or warn the patients and their physicians of the defects and risks renders the devices unreasonably dangerous to the patient and their physicians. The failure to warn patients and their physicians of the defects and risks of the devices in question was a producing cause of Plaintiff's injuries.

5.22    Plaintiff is unaware of any evidence that the Defendants warned Plaintiff's physicians of the defects and risks of the devices prior to Plaintiff's surgery.  Plaintiff alleges on information and belief that had her physicians been warned or notified of the defects and risk of the devices prior to Plaintiff's surgery they would have not used the devices or subjected Plaintiff to the risks associated with using these devices.  Plaintiff also alleges on information and belief that had her physicians been warned or notified of the defects and risk of the devices prior to Plaintiff's surgery they would have warned the Plaintiff prior to her surgery of the defects and risks associated with using the devices and Plaintiff would have been afforded the opportunity to make an informed decision on whether to proceed with the surgery given the risks.

5.23    As a direct and proximate result of Defendants' negligence, manufacturing and design defects, Plaintiff has incurred losses and damages for personal injury, loss of use and enjoyment of life, the need for periodic medical examination and treatment, and economic losses, including additional medical expenses, and the expenditure of time and money, and will continue to incur losses and damages in the future.

5.24    Due to Defendants' negligence, failure to warn, manufacturing, and design defects, Plaintiff is entitled to compensatory damages in a sum to be determined by a jury, plus punitive damages in a sum equal to a multiplier of damages determined to be adequate by a jury.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## PLAINTIFF'S FOURTH CAUSE OF ACTION

**D.      (NEGLIGENCE) Against all DEFENDANTS**

5.25    Plaintiff hereby incorporates the allegations contained in the preceding paragraphs, as though fully set forth herein.

5.26    Plaintiff's injuries associated with having numerous remedial surgeries and procedures as a result of the injuries she suffered in the April 23, 2019 surgery were all the result of Defendants' defective Echelon Flex Endopath Staplers.

5.27    At all times herein relevant, Defendants, and each of them, were in the business of designing, manufacturing, assembling, constructing, inspecting, and selling various types of medical devices, including the subject Echelon Flex Endopath Stapler. Defendants were further in the business of inspecting, maintaining, installing and selling at retail to members of the public various types of medical devices designed and manufactured by Defendants, including the subject Echelon Flex Endopath Stapler.

5.28    At all times herein relevant, Defendants so negligently and carelessly designed, manufactured, constructed, assembled, inspected, and/or sold the subject Echelon Flex Endopath Stapler that it was dangerous and unsafe to be used for its intended uses.

5.29    Furthermore, at all times relevant to this action, Defendants so negligently and carelessly inspected, maintained, installed, and sold the subject Echelon Flex Endopath Staplers that it was dangerous and unsafe for its intended uses.

5.30    Defendants had a duty to exercise reasonable care, and to comply with the existing standards of care, in their preparation, design, research, development, manufacture, inspection, labeling, marketing, promotion, and sale of the subject Echelon Flex Endopath Staplers device that was used on Plaintiff.

5.31    At all times herein relevant, Defendants knew or reasonably should have known that the subject Echelon Flex Endopath Staplers was unreasonably dangerous and defective when used as directed and designed, including but not limited to its failure to create staple lines leading to anastomotic leaks and other complications and injuries.

5.32    Based on what Defendants knew or should have known as described above, Defendants deviated from the standard of care and were negligent in introducing the Echelon Flex Endopath Stapler, which was unreasonably dangerous and defective when used as directed and designed, into the stream of commerce.

5.33    Further, Defendants were negligent for not providing sufficient notice or warnings of the risks associated with using the Echelon Flex Endopath Stapler, including the risks associated with malfunction.

5.34    The injuries and damages suffered by Plaintiff were the reasonably foreseeable results of Defendants' negligence.

5.35    As a direct and proximate result of Defendants' negligence, failure to warn, manufacturing and design defects, Plaintiff has incurred losses and damages for personal injury, loss of use and enjoyment of life, the need for periodic medical examination and treatment, and economic losses, including additional medical expenses, and the expenditure of time and money, and will continue to incur losses and damages in the future.

WHEREFORE, Plaintiff requests relief as hereinafter provided.

## VI. <u>DAMAGES</u>

6.1     Plaintiff Carrie Carter has been injured and damaged, including, but not limited to, repeated medical hospitalizations, medical procedures, past and future medical expenses, past and future lost wages, past and future diminished earning capacity, past and future pain and suffering, both physical and mental, past and future impairment of the ability and capacity to enjoy life and its pleasures, past and future disfigurement, and all other damages recoverable under Florida law.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, by way of damages in such amounts as might be proven at the time of trial and determined by the trier-of-fact as reasonable and just under the evidence, as well as for costs and disbursements herein incurred and for such other and further relief as the court may deem just and proper.

RESPECTFULLY SUBMITTED,

**LAW OFFICE OF PETER RICCIARDELLI**

*/s/ Peter Ricciardelli*
Peter Ricciardelli
Colorado Bar No.
126 W. Colorado Avenue
PO BOX 32
Telluride, Colorado 81435
(970) 728-3808
peter@tridelaw.com

and

**MARTIN BAUGHMAN, PLLC**

*/s/ Ben C. Martin*
Ben C. Martin (*admission application forthcoming*)
Texas Bar No. 13052400
Kolter C. McKenzie (*admission application forthcoming*)
Texas Bar No. 24067762
3141 Hood Street, Suite 600
Dallas, Texas 75219
(214) 761-6614
Facsimile: (214) 744-7590
bmartin@martinbaughman.com
kmckenzie@martinbaughman.com

**ATTORNEYS FOR PLAINTIFF**

## JURY REQUEST

Plaintiff respectfully requests a jury trial.